# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 03-1603

_____

| | | |
|---|---|---|
| Mary A. Robert, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | |
| Siegel-Robert, | * | |
| | * | Appeal from the United States |
| Intervenor, | * | District Court for the Eastern |
| | * | District of Missouri. |
| v. | * | |
| | * | |
| United States of America, | * | |
| | * | |
| Defendant - Appellee. | * | |

_____

Submitted: December 15, 2003
Filed: April 29, 2004

_____

Before MELLOY, McMILLIAN, and BOWMAN, Circuit Judges.

_____

MELLOY, Circuit Judge.

Mary A. Robert appeals the district court's[1] adverse grant of summary judgment in her action to quash four separate third-party IRS summonses. We agree with Ms. Robert that the summonses issued as a result of improper ex parte

_____

[1]The Honorable Charles A. Shaw, United States District Judge for the Eastern District of Missouri.

communications between the IRS Appeals Office and Examination Division. See Internal Revenue Service Restructuring and Reform Act (Restructuring Act) of 1998, Pub. L. No. 105-206, 112 Stat. 68 (charging the Commissioner of Internal Revenue with the duty to provide an independent Appeals Office and prohibit ex parte communications that appear to compromise the independence of the Appeals Office); Rev. Proc. 2000-43, 2000-2 C.B. 404 (setting forth guidelines for implementation of the restriction on ex parte communications). We find, however, that in this case, the ex parte communications do not prevent enforcement of the summonses. The judgment of the district court is affirmed.

## I. Facts

Ms. Robert, in her capacity as the trustee and income beneficiary of a marital trust established by her late husband, owned approximately seven million shares out of a total of twelve million outstanding shares of Siegel-Robert, Inc.[2] In 1998, she

---

[2]The United States District Court for the Eastern District of Missouri, in a minority shareholders' appraisal proceeding, discussed the history, operations, and "fair value" of Siegel-Robert. See Swope v. Siegel-Robert, Inc., 74 F. Supp. 2d 876, 879-910 (E.D. Mo. 1999), aff'd in part and rev'd in part by 243 F.3d 486 (8th Cir. 2001). In our review of that opinion, we held it was not appropriate under Missouri law, in the context of unwilling minority sellers' appraisals, to discount the value of shares due to a lack of marketability or due to minority shareholder status. Swope, 243 F.3d at 496-97. The issue before the court was the "fair value" of the minority shares rather than the "fair market value," which would have included market considerations such as minority status and the lack of willing buyers. See id. at 493 ("Because 'fair market value' is irrelevant to the determination of fair value, market forces, such as the availability of buyers for the stock, do not affect the ultimate assessment of fair value in an appraisal proceeding."). Because of this difference, we determined that an IRS appraisal prepared for estate tax purposes was not relevant in the context of that appraisal proceeding. See id. at 498 ("Regardless, appraisals for estate tax purposes are not relevant to the determination of fair value pursuant to a dissenters' appraisal proceeding."). We nevertheless refer the reader to the Swope opinions because we do not set out the same detailed review of the corporation's history in this opinion.

transferred 1,800,000 shares from the trust to her children in exchange for promissory notes structured as non-recourse debt. She secured the notes with Siegel-Robert stock and established a mechanism to execute on the stock through a stock redemption agreement between herself, Siegel-Robert, and her children. Ms. Robert claimed that the promissory notes were worth as much as the transferred stock and characterized the transfers as related party sales under I.R.C. § 267. Also, during 1998 and 1999, she transferred 29,750 shares to her children and other relatives. She characterized these additional transfers as gifts.

Ms. Robert listed minority share values of $21.73 and $23.67 for the Siegel-Robert stock on her 1998 and 1999 gift tax returns, respectively. Ms. Robert used a private appraiser to arrive at these values. Although she maintains that her valuation was accurate, she concedes that, if inaccurate, any resultant increase in valuation of the transferred stock must be treated as a gift.

In 2000, the IRS began an audit of Ms. Robert's 1998 and 1999 gift tax returns. Ms. Robert cooperated and provided financial information. The IRS Estate Tax Examiner assigned to Ms. Robert's case, Paul Latt, disagreed with Ms. Robert's valuation and determined that an IRS appraisal was needed. IRS Financial Analyst Ernest Gruenfeld conducted an appraisal and determined that the appropriate minority share prices for the 1998 and 1999 transfers were $55.52 and $44.17, respectively. Based on Mr. Gruenfeld's appraisal and the number of shares that Ms. Robert transferred, Mr. Latt determined that Ms. Robert owed the IRS a deficiency payment of approximately $34 million regarding the 1998 transfers and $233,000 regarding the 1999 transfers. Mr. Latt was aware of a one million share decrease in the number of outstanding shares during 1998 but did not know what happened to those shares. Mr. Latt did not incorporate this share decrease into his valuation and deficiency determination as set out in his examination report.

On March 2, 2001, Mr. Latt sent Ms. Robert a "thirty-day letter" to propose these deficiencies. The letter was accompanied by Mr. Latt's examination report and Mr. Gruenfeld's appraisal. The March 2, 2001 letter was not a statutory deficiency notice.

On April 2, 2001, Ms. Robert replied with a letter of protest in which she set forth arguments contesting the IRS findings and requested an appeals conference. On May 18, 2001, the Appeals Office assigned IRS Appeals Officer Daniel Mannion to handle Ms. Robert's appeal. Mr. Mannion previously had worked on a gift tax case that involved Ms. Robert's deceased husband and a dispute over the value of Siegel-Robert stock. In addition, Mr. Mannion was familiar with the opinions from this court and the Eastern District of Missouri in which we approved a method for determining the "fair value" of Siegel-Robert stock. See Swope v. Siegel-Robert, Inc., 74 F. Supp. 2d 876, 879-910 (E.D. Mo. 1999), aff'd in part and rev'd in part by 243 F.3d 486 (8th Cir. 2001).

Mr. Mannion claims that, on August 12, 2001, he conducted an initial review of Ms. Robert's file and determined that Mr. Gruenfeld's appraisal was inadequate because it did not follow the methodology set forth in the Swope case. "Shortly after" this review, Mr. Mannion contacted Mr. Latt on an ex parte basis to tell Mr. Latt that Mr. Gruenfeld's appraisal was inadequate. In addition, Mr. Mannion sent Mr. Latt a copy of Ms. Robert's protest with instructions to forward the protest to Mr. Gruenfeld for review so that Mr. Gruenfeld could revise the IRS appraisal.

On September 10, 2001, Ms. Robert's attorney called Mr. Mannion to request a meeting. Mr. Mannion did not tell Ms. Robert's attorney about the August ex parte communications with Mr. Latt. Ms. Robert's attorney stated that Mr. Mannion set a meeting date for October 3, 2001, because Mr. Mannion claimed it would take approximately three weeks to review Ms. Robert's file.

At the October 3 meeting, two of Ms. Robert's attorneys discussed the case with Mr. Mannion and provided a written critique of Mr. Gruenfeld's appraisal. Mr. Mannion asked about the unaccounted-for one million share decrease in outstanding Siegel-Robert stock during 1998. Ms. Robert's attorneys stated that the marital trust redeemed the one million shares of Siegel-Robert stock for cash so that the trust could diversify its holdings. Mr. Mannion believed this redemption potentially raised a new gift tax issue. In addition, he suggested that the IRS obtain an outside appraisal to value the stock. Again, Mr. Mannion did not tell Ms. Robert's attorneys about the August ex parte communications with Mr. Latt, nor did he tell them of his intention to conduct future ex parte communications with Mr. Latt. Mr. Mannion concluded the meeting by telling Ms. Robert's attorneys that he would contact them in January of 2002 to discuss resolution of the protest.

On October 3, 2001, after meeting with Ms. Robert's attorneys, Mr. Mannion called Mr. Latt to tell him about the new information concerning the 1998 one million share decrease and to let him know that Ms. Robert's attorneys had submitted a written critique of Mr. Gruenfeld's appraisal. On October 4, 2001, Mr. Latt met with Mr. Mannion and received a copy of the written critique. On October 15, 2001, Mr. Mannion referred the new information regarding the one million share decrease to Mr. Latt's IRS Examination Supervisor, Chris Mezines, and suggested that this decrease might involve the same bargain sale/gift issues already under examination.

On October 29, 2001, Mr. Latt sent a letter to Ms. Robert's attorneys to ask for information about the one million share decrease. Mr. Latt's letter referred to the fact that the Appeals Office requested that he gather information about the one million share transfer. In December 2001, Mr. Latt sent Ms. Robert's attorneys another letter to explain that the IRS had retained a private appraiser and to request additional financial information. In a follow-up call, Mr. Latt told Ms. Robert's attorneys that Mr. Mannion believed Mr. Gruenfeld's initial appraisal was inadequate. Ms. Robert's attorneys challenged Mr. Latt's authority because the Appeals Office had jurisdiction

over the case and Mr. Mannion had last told them that he would contact them in January to resolve the case.

On January 11, 2002, Mr. Latt called Ms. Robert's attorneys and left a telephone message. Ms. Robert's attorneys saved the recorded message and prepared a transcript of the message. In the message, Mr. Latt made clear that Mr. Mannion was still in charge of the case; the examination division was going to be "doing the leg work" for Mr. Mannion to collect financial data and obtain a private party appraisal; and Mr. Mannion had stated the "in house appraisal was not going to do the job as far as the IRS was concerned."

Ms. Robert's attorneys then arranged a January 23, 2002 meeting with Mr. Mannion and his supervisor, Chris Roth, to discuss the ex parte communications between Mr. Mannion, Mr. Latt, and Mr. Mezines. At the January 23 meeting, Mr. Mannion stated that, during the October 3, 2001 meeting, Ms. Robert successfully refuted the valuation that Mr. Gruenfeld prepared for the IRS. On January 29, 2002, Ms. Robert's attorneys met again with Mr. Mannion and Mr. Roth. Mr. Latt, Mr. Mezines, and IRS counsel were present for this meeting. Ms. Robert's attorneys suggested that, as a remedy for the ex parte communications, the IRS should either assign a different appeals officer to review the record independently or issue a statutory notice of deficiency. Mr. Roth stated that he would coordinate the IRS response to these proposals. Several days later, Mr. Roth called Ms. Robert's attorneys and stated that instead of assigning a new appeals officer, the IRS would assign a new examiner and start a new audit.

The IRS assigned a new examiner, John Crowe, to conduct the new audit. Mr. Crowe requested the financial records necessary for a third-party appraisal of the Siegel-Robert stock. He then issued the four summonses that are the subject of the current action. Mr. Crowe directed these summonses to Siegel-Robert and its president, vice-president, and treasurer.

On March 14, 2002, Ms. Robert petitioned the district court to quash the summonses. Ms. Robert argued that the summonses were issued as a direct result of the ex parte communications, to prepare the case for litigation, and as a direct result of Mr. Mannion's failure to review the case independently and impartially. She specifically argued that the summonses were issued in bad faith and that court enforcement of the summonses would be an abuse of the court's process. Ms. Robert requested discovery and an evidentiary hearing.

On June 10, 2002, the government responded and simultaneously filed a motion for summary judgment to seek enforcement of the summonses. The government provided affidavits from Messrs. Mannion, Latt, Mezines, and Crowe. Ms. Robert claims that, through these affidavits, the IRS disclosed numerous previously undisclosed ex parte communications. In particular, Ms. Robert and her attorneys claim that prior to receipt of the government's motion and the accompanying affidavits, they knew only of the October 3, 2001 discussion between Messrs. Mannion and Latt. Ms. Robert claims she learned of the following allegedly improper ex parte communications only through the government's affidavits: the August 13, 2001 discussion between Messrs. Mannion and Latt; an August 13, 2001 discussion between Messrs. Latt and Gruenfeld; the October 4 meeting between Messrs. Latt and Mannion; an October 4, 2001 discussion between Messrs. Latt and Mezines; the October 15, 2001 discussion between Messrs. Mannion and Mezines; and discussions on an unknown date between an examiner and personnel at the private appraisal firm that the IRS hired in late 2001.

On July 2, 2002, Ms. Robert filed a motion under Fed. R. Civ. P. 56(f) to strike the government's motion for summary judgment or, in the alternative, for an extension of time that would allow for a period of discovery. On November 14, 2002, the district court denied Ms. Robert's motion, denied her request for discovery and an evidentiary hearing, and ordered her to respond to the government's outstanding motion for summary judgment. On January 9, 2003, the district court granted the

government's motion, finding that "petitioner has cited no cases for the proposition that violation of the IRS's internal regulation against ex parte communications by an appeals officer invalidates any subsequently-issued summons for information." Finally, the district court found that the facts suggested neither that enforcement of the summonses would be an abuse of the court's process nor that the ex parte communications suggested bad faith by the IRS.

## II. Standard of Review

We review under a de novo standard the district court's summary enforcement of, and refusal to quash, an IRS summons. E.g., United States v. Scherping, 187 F.3d 796, 800 (8th Cir. 1999) (summary judgment standard); Crystal v. United States, 172 F.3d 1141, 1145 (9th Cir. 1999) (summary summons enforcement standard). We review the district court's denial or limitation of discovery in an action to enforce or quash an IRS summons for abuse of discretion. United States v. Lask, 703 F.2d 293, 300 (8th Cir. 1983); Mazurek v. United States, 271 F.3d 226, 234 (5th Cir. 2001).

## III. Violation of the Restriction on Ex Parte Communications

As an initial matter, we may dispense with the IRS argument that the ex parte communications were permissible and not in violation of the Restructuring Act and Rev. Proc. 2000-43. Congress passed the Restructuring Act to ensure that "taxpayers would have adequate protections when the agency exercised its powers in an improper fashion." National Commission on Restructuring the Internal Revenue Service, Report of the National Commission on Restructuring the Internal Revenue Service, A Vision for a New IRS, at 8 (June 25, 1997). One method Congress chose to provide these protections was to direct the Commissioner of Internal Revenue to enhance the independence of the IRS Appeals Office by restricting certain types of ex parte communication between the Appeals Office and other areas of the IRS. Congress mandated, among other things, that:

The Commissioner of the Internal Revenue shall develop and implement a plan to reorganize the Internal Revenue Service. The plan shall . . . (4) ensure an independent appeals function within the Internal Revenue Service, including the prohibition in the plan of ex parte communications between appeals officers and other Internal Revenue Service employees to the extent that such communications appear to compromise the independence of the appeals officers.

Restructuring Act § 1001(a).

In Revenue Procedure 2000-43, promulgated under the Restructuring Act, the IRS set forth its own position regarding which communications appear to compromise the independence of the appeals officer. The IRS distinguished between "ministerial, administrative, and procedural matters," on the one hand, and substantive matters, on the other. Id. § 3. As to the former, the IRS does not consider ex parte communications to be prohibited under the Restructuring Act. The IRS provided examples of communications considered to be permissible: questions regarding whether certain information was requested and received; questions regarding whether a document referred to in the work papers but not found in the file is available; questions to clarify illegible documents; questions about case controls on the IRS's management information systems; and questions regarding tax calculations that are purely mathematical in nature. Id. § 3, at Q&A 5. As clearly demonstrated through this list, the IRS itself set forth a limited view of communications that would be considered ministerial and that could occur on an ex parte basis between the Appeals Office and other Divisions.

At least some of the communications in the present case did not involve merely ministerial, administrative, and procedural matters, but rather, involved the substance of Ms. Robert's appeal. Accordingly, under the Restructuring Act and the IRS's own procedures, at least some of the communications in the present case should not have taken place on an ex parte basis. Mr. Mannion should not have expressed his

opinions regarding the sufficiency of Mr. Gruenfeld's appraisal to Messrs. Latt and Mezines on an ex parte basis. In addition, he should not have shared with the Examination Division the written critique and additional information that Ms. Robert's attorneys provided without including Ms. Robert's attorneys in the communications. Finally, he should not have recommended to Mr. Mezines that the Examination Division hire an outside appraiser to value the Siegel-Robert stock. At a minimum, these communications appeared to compromise Mr. Mannion's independence.

The ex parte communications are made more troubling by the fact that the IRS delayed disclosure of at least some of these communications until this matter reached the stage of litigation. Further, even on appeal to this court, the IRS did not willingly concede the improper nature of its ex parte communications. If anything, this denial by the IRS suggests an institutional failure to embrace the ex parte restrictions and militates against our enforcement of the summonses.

Nevertheless, as explained below, we will enforce the summonses in this case because Congress did not specifically legislate a limitation on the IRS summons power as a remedy for violation of the ex parte restrictions; the IRS did proscribe an administrative remedy to address violations of the ex parte restrictions; the Supreme Court has cautioned that we should be slow to erect barriers to enforcement of IRS summonses; and, we discern no improper purpose or bad faith behind issuance of the IRS summonses nor nexus between the improper communications and any improper purpose for the investigation.

IV. Validity of the Summonses

The Supreme Court made clear in United States v. Powell, 379 U.S. 48 (1964), that a court should not enforce an IRS summons if enforcement will result in abuse of the court's process. The Court stated:

> It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused. Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation.

Id. at 58 (footnote omitted). The above listing is not an exhaustive inventory of the potential "improper purposes" that might reflect on the good faith of an investigation and prevent enforcement of a summons. See id. (stating that taxpayer "'may challenge the summons on any appropriate ground'" (quoting Reisman v. Caplin, 375 U.S. 440, 449 (1964))). Rather, courts may consider new situations as they arise to determine whether the enforcement of a summons would further an improper purpose, reflect on the good faith of the IRS, or result in an abuse of the court's process. See United States v. LaSalle Nat'l Bank, 437 U.S. 298, 318 n.20 (1978) ("These requirements are not intended to be exclusive. Future cases may well reveal the need to prevent other forms of agency abuse of congressional authority and judicial process.").

In Powell, the Court also set forth a mode of analysis to determine the good faith of the IRS for the purpose of enforcing an IRS summons. "[The IRS] must show [1] that the investigation will be conducted pursuant to a legitimate purpose, [2] that the inquiry may be relevant to that purpose, [3] that the information sought is not already within the [IRS]'s possession, and [4] that the administrative steps required by the Code have been followed . . . ." 379 U.S. at 57-58. If the IRS makes this showing, the challenger is afforded the opportunity to rebut the IRS showing as to one or more of the requirements "or to demonstrate that judicial enforcement of the summons would otherwise constitute an abuse of the court's process." United States v. Claes, 747 F.2d 491, 494 (8th Cir. 1984); see also Lask, 703 F.2d at 297. The Supreme Court has stated that courts should be slow to erect barriers to enforcement of IRS summonses where the summonses are being used to further the IRS mission of effectively investigating taxpayer liabilities. United States v. Euge, 444 U.S. 707,

711 (1980) ("[T]his Court has consistently construed congressional intent to require that if the summons authority claimed is necessary for the effective performance of congressionally imposed responsibilities to enforce the tax Code, that authority should be upheld absent express statutory prohibition or substantial countervailing policies."). Accordingly, the burden on the IRS to make a prima facie showing as to the Powell good faith requirements is slight, and the burden on the challenger to rebut the IRS showing as to one or more of these requirements "or to demonstrate that judicial enforcement of the summons would otherwise constitute an abuse of the court's process" is great. Claes, 747 F.2d at 494 ("That burden is a heavy one. The party must show either that the IRS is acting in bad faith or that the IRS has abandoned any civil purpose in the investigation.").

Ms. Robert's challenge focuses generally on the good faith and abuse of process concerns expressed in Powell. She argues that the general prohibition on abuse of the court's process is sufficiently broad to permit the court to quash a summons based on an underlying violation of a law or rule by the IRS. See In re Spencer, 123 B.R. 858, 862 (Bankr. N.D. Cal. 1991) (stating that if issuance of a summons is in violation of a bankruptcy stay, the court "should quash the Summons unless good cause exists for declining to do so"). But see Mimick v. United States, 952 F.2d 230, 232 (8th Cir. 1991); United States v. Gilbert C. Swanson Found., Inc., 772 F.2d 440, 441 (8th Cir. 1985) (refusing to hold that a rule violation mandated the quashing of a summons and instead adopting an approach that "'requires the court to evaluate the seriousness of the violation under all the circumstances including the government's good faith and the degree of harm imposed by the unlawful conduct'" (quoting United States v. Payne, 648 F.2d 361, 363 (5th Cir. 1981))). To the extent that Ms. Robert's challenge fits into the framework set forth in Powell, she focuses on the "proper purpose" requirement. In particular, she argues that the IRS "violated the rule [against certain ex parte communications] for the improper purpose of trying to improve its litigating position."

In Gilbert C. Swanson Foundation, we stated, "We take very seriously the statutory and administrative regulations that govern the issuance of IRS summonses. They are an essential check on the discretion of an agency with broad investigatory powers over all American citizens." 772 F.2d at 441. Our approach, however, was not to adopt a per se rule and hold unenforceable all summonses that involve a violation of a rule or law. Id. Rather, we adopted the position of the Fifth Circuit to hold that the enforceability of a summons that the IRS issued through a violation of a law or rule depends upon all of the circumstances surrounding the summons, including the seriousness of the violation, the government's good faith, and the harm, if any, caused by the violation. See id. (adopting the Fifth Circuit's method as set forth in Payne, 648 F.2d at 363).

Applying this test, we find that the violation in the present case was serious. The ex parte communications violated the spirit of the Restructuring Act and its congressional mandate to the Commissioner, not just the letter of Revenue Procedure 2000-43. Accordingly, the violation was not merely a violation of a non-binding, internal IRS guideline.

Congress, however, delegated to the Commissioner the responsibility for reorganizing the IRS and ensuring compliance with the restriction on ex parte communications. Congress did not legislate a specific remedy for violation of the restriction, and we generally will not fashion a remedy where Congress creates a right but fails to create an accompanying remedy. See United States v. James Daniel Good Real Property, 510 U.S. 43, 63 (1993). In James Daniel Good Real Property, the Court said:

> We have long recognized that "many statutory requisitions intended for the guide of officers in the conduct of business devolved upon them . . . do not limit their power or render its exercise in disregard of the requisitions ineffectual." French v. Edwards, 80 U.S. (13 Wall.) 506, 511(1872). We have held that if a statute does not specify a consequence for noncompliance with statutory timing provisions, the

> federal courts will not in the ordinary course impose their own coercive sanction.

Id. (alteration in original).

Exercising its delegated authority under the Restructuring Act, the IRS provided that violations of the ex parte restriction would be addressed "in accordance with existing administrative and personnel processes." Rev. Proc. 2000-43, § 3, at Q&A 28. Accordingly, an alternate remedy exists for the IRS to address the present violations. The presence of this alternate means to address the violations suggests that it is not necessary to quash the current summonses.

Looking at the broader question of good faith, we find nothing to suggest that the communications and the resultant summonses were motivated by any goal other than the accurate determination of Ms. Robert's tax liability. While the fact of the ex parte communications and the failure to timely disclose these communications is improper and troublesome, there are no parallel criminal proceedings for which the summonses might serve as improper discovery tools, there is no allegation of an ulterior motive on the part of Mr. Mannion or any of the Examination Division personnel, and there are no allegations that the IRS is attempting to coerce Ms. Robert to settle some other, collateral matter. In short, there is nothing to suggest any purpose to issuance of the summonses other than a desire to accurately appraise the Siegel-Robert stock and accurately determine Ms. Robert's tax liability.

Ms. Robert's entire argument regarding good faith and improper purpose hinges on her interpretation of the Appeals Office's role subsequent to passage of the Restructuring Act. While it is undisputed that the Appeals Office served a role as a dispute resolution body prior to the Restructuring Act, Ms. Robert characterizes the Appeals Office today as a limited appellate review body that may only affirm or reverse the IRS position that is presented for review. Ms. Robert, therefore, argues that any action by the Appeals Office that might change the IRS position from that

expressed in the thirty-day letter is a wrongful attempt by the Appeals Office to engage in partisanship and enhance the IRS position in future litigation. Consequently, to accept Ms. Robert's bad faith argument, we would be required to view the Appeals Office as limited in its authority to either (1) adopt the IRS position as set forth in the thirty day letter or (2) adopt the taxpayer's position for the tax years under investigation, even if an Appeals Officer comes to believe that neither position accurately reflects the taxpayer's liability.

We disagree with this characterization of the role of the Appeals Office. The Restructuring Act is concerned with the independence of the Appeals Office and ex parte communications. See Restructuring Act § 1000(a)(4). The Restructuring Act contains no prohibition on the referral of a matter from the Appeals Office back to the Examination Division if the matter appears to have reached the Appeals Office prematurely or if new, material evidence is disclosed to the Appeals Office. See Rev. Proc. 2000-43 § 3:

> Q-7  Does the prohibition on ex parte communications change the criteria for premature referrals?
>
> A-7  As a general rule, there is no change to current criteria or procedures. In essence, [the Restructuring Act] reinforces the instructions in Section 8.2.1.2 of the Internal Revenue Manual (IRM) and reaffirms Appeals' role as the settlement arm of the Service. If a case is not ready for Appeals consideration, Appeals may return it for further development or for other reasons described in IRM 8.2.1.2.

The Restructuring Act simply instructs that such referrals should not occur on an ex parte basis.

The history of the Restructuring Act, as set forth by the IRS in Rev. Proc. 2000-43, demonstrates that the Appeals Office maintains its role as the settlement arm of the IRS and is not as limited in its power as Ms. Robert suggests. In particular, the

legislative history reveals that Congress rejected a more far-reaching overhaul of the Appeals Office when it passed the Restructuring Act.

> S. Rep. No. 1669, 105th Cong., 2nd Sess., § 304(a) (Feb. 24, 1998), would have established an independent Office of Appeals in the Internal Revenue Service, the head of which was to be appointed by and report directly to the Oversight Board. Further, this proposal would have barred Appeals from considering issues not "raised" by the originating function and prohibited "any communication" with the originating function unless the taxpayer or taxpayer's representative had an opportunity to be present.

Rev. Proc. 2000-43 § 2. As enacted, the Restructuring Act only prohibits those ex parte communications that "appear to compromise the independence of the appeals officers." Restructuring Act § 1000(a)(4). It does not prohibit the Appeals Office from examining new issues or returning a case for further examination. Further, it does not bar all ex parte communications. The IRS, in its regulation, concluded:

> When the evolution of § 1000(a)(4) . . . is considered in light of Appeals['] longstanding methods of operation, it can be fairly concluded that Appeals must be accorded a significant degree of independence from other IRS components, and should be mindful to avoid ex parte communications with other IRS functions that might appear to compromise that independence. The statutory provision cannot, however, be interpreted as mandating a major redesign of the fundamental processes Appeals has traditionally followed to carry out its dispute resolution mission.

Rev. Proc. 2000-43 § 2. The IRS, then, concluded that even after Congress passed the Restructuring Act, the Appeals Office was to remain "a flexible administrative settlement authority" rather than a rigidly constrained appellate review organization limited to affirming or rejecting proposed deficiencies. Id. Rev. Proc. 2000-43 proceeds to make clear the IRS position that the Appeals Office retains the ability to "(a) return[] cases that are not ready for Appeals consideration, (b) rais[e] certain new

issues, and (c) seek[] review and comments from the originating IRS function with respect to new information or evidence furnished by the taxpayer or representative." Id. We agree.

Because we find nothing improper in the fact of the referral of Ms. Robert's case for further development–only in the ex parte nature of this referral–we find no evidence to suggest an improper purpose behind the summonses or bad faith in issuance of the summonses. Because referral of the case for further development was not improper, we cannot find that the present violations of the ex parte restriction caused any harm to Ms. Robert. Accordingly, under Gilbert C. Swanson Foundation, we do not find it necessary to quash the summonses.

## V. Discovery

We next address Ms. Robert's arguments concerning the district court's denial of discovery. Discovery is not necessary in every summons action, and, in fact, the summary nature of proceedings on an IRS summons militate against expansive discovery. See United States v. Stuart, 489 U.S. 353, 369 (1989) ("'[S]ummons enforcement proceedings should be summary in nature and discovery should be limited.'" (quoting S. Rep. No. 97-494, Vol. 1, p. 285 (1982))). However, in many cases, some discovery is appropriate and should be allowed. See United States v. Kis, 658 F.2d 526, 540 (7th Cir. 1981) ("[W]e do not want to put the taxpayer in the anomalous position of having to allege specific facts when he has no means to gather that information through discovery . . . ."); United States v. Cortese, 614 F.2d 914, 921 n.12 (3d Cir. 1980) ("[I]n almost every case, the information needed to demonstrate an improper motive on the part of the Service is in the hands of the government. Normally, the taxpayer's only access to such information is through limited basic discovery carefully tailored to the purposes of the inquiry. Accordingly, such discovery should be provided."). To strike a balance between the summary nature of summons proceedings and the relative disadvantage taxpayers face regarding access to information, we have held that discovery in a summary summons

proceeding is appropriate where a taxpayer makes a substantial preliminary showing that enforcement of a summons would result in an abuse of the court's process. <u>Tax Liabs. v. United States</u>, 866 F.2d 1015, 1019 (8th Cir. 1989).

Ms. Robert made a substantial, in fact conclusive, showing that the IRS conducted improper ex parte communications. She made no showing, however, that the resultant summonses were issued for an illegitimate purpose that would reflect on the good faith of the IRS or cause our enforcement to be an abuse of process. Ms. Robert argued that discovery was necessary because she did not know the contents of the ex parte communications and did not even know of many of the communications until the government filed its motion for summary judgment. In the affidavits, however, the government disclosed both known and unknown communications, none of which suggests a motive other than a desire to accurately value Siegel-Robert stock. Because Ms. Robert failed to make the requisite showing and demonstrate that discovery would likely lead to useful, relevant evidence, the district court did not abuse its discretion.

The judgment of the district court is affirmed.

_____