T.C. Memo. 2006-171

UNITED STATES TAX COURT

J. JEAN MOORE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11634-05L.                    Filed August 17, 2006.

<u>Timothy W. Tuttle</u> and <u>D. Anthony Gaston</u>, for petitioner.

<u>Karen Nicholson Sommers</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  Petitioner seeks review of respondent's notice of determination sustaining a notice of Federal tax lien filing relating to petitioner's outstanding 1997 through 2002 individual Federal income taxes.  The issue for decision is whether respondent's Appeals Office conducted prohibited ex parte communications, and if so what remedy is appropriate.

Unless otherwise indicated, all section references are to the Internal Revenue Code as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

This case was submitted under Rule 122, but other than establishing the residence of petitioner in San Diego, California, the stipulation of the parties relates only to exhibits.

During the 1990s and until at least the end of 2003, petitioner solely owned and operated, through a limited liability company (LLC), an eldercare business in California and in Oregon.[1]

In addition to the income petitioner received relating to the eldercare business, petitioner received rental income relating to residential and commercial real property that petitioner owned in California and in Oregon.

In 2001, after an audit and a criminal tax investigation by respondent relating to petitioner's individual Federal income taxes for 1992 through 1995, petitioner was charged with and was convicted on several counts of tax evasion. As a condition of

---

[1] References in our findings of fact to ownership, and to transfers, of real property and of other assets are not intended to constitute ultimate findings of fact as to the true legal and equitable ownership of the real property and other assets involved in this case.

her probation, petitioner was ordered to pay $250,000 toward her outstanding 1992 through 1995 Federal income taxes, penalties, and interest.

On her 1997 through 2001 individual Federal income tax returns, which she late filed on November 7, 2002, and on her timely filed 2002 individual Federal income tax return, petitioner reported a cumulative total tax liability of approximately $1 million. Petitioner made no payments to respondent with her filed tax returns, nor had petitioner made any payments via withholding or estimates.

Respondent did not audit and did not otherwise dispute petitioner's 1997 through 2002 Federal income taxes as reported by petitioner on her tax returns.[2]

For 2003 and 2004, petitioner apparently has timely filed her individual Federal income tax returns, and for purposes of this collection action respondent has not questioned the tax liabilities and tax payments reported thereon.

On September 23, 2003, respondent filed a Federal tax lien against petitioner relating to petitioner's assessed and unpaid 1997 through 2002 cumulative total tax liability of approximately $1 million, and on September 26, 2003, respondent mailed to

---

[2] Information relating to petitioner's 1996 individual Federal income tax return is not in the record.

petitioner a notice of tax lien filing with regard to the tax lien that respondent had filed.

On October 24, 2003, petitioner timely requested a section 6320 collection due process (CDP) hearing with respondent's Appeals Office for the purpose of securing the release of respondent's filed tax lien against petitioner.

On January 1, 2004, petitioner organized a corporation and transferred her eldercare business to the new corporation.

Ownership of the new corporation was placed 51 percent in the name of petitioner and 49 percent in the name of petitioner's son and daughter-in-law.  At some point, petitioner transferred some of the real property she owned to her daughter.

 On March 11, 2004, during the CDP hearing, petitioner submitted to respondent an offer-in-compromise (OIC).  In her OIC, petitioner offered to make a payment of $258,000 in full settlement and compromise of her cumulative total then accrued and outstanding approximate $1.8 million in Federal income taxes, additions to tax, and interest for 1992 through 1995 and for 1997 through 2002.

With the filing of her OIC, petitioner did not make any payment to respondent, but petitioner did offer to pay the $258,000 within 90 days of respondent's acceptance of her OIC.[3] Petitioner planned to sell assets in order to obtain the $258,000.

On April 15, 2004, petitioner paid respondent the final $79,166 she owed relating to her criminal conviction, and petitioner asked that the $79,166 be credited toward the $258,000 she would owe under the pending OIC.

In connection with the Appeals Office's consideration of petitioner's OIC, a number of communications about petitioner occurred among respondent's Appeals officer, an offer specialist assigned to work on petitioner's OIC, and two of respondent's revenue officers, one of whom worked in California and one of whom worked in Oregon. Before petitioner's CDP hearing with respondent's Appeals officer, both of these revenue officers had been involved in attempting to collect petitioner's outstanding taxes for the years in issue. The communications between respondent's Appeals officer and the offer specialist, on the one hand, and respondent's two revenue officers, on the other,

---

[3] By Mar. 11, 2004, petitioner had paid respondent $170,834 due as a result of the criminal conviction relating to her 1992 through 1995 Federal income taxes, which amount is separate from the $258,000 petitioner offered to pay respondent under the offer-in-compromise.

occurred in person, over the telephone, and via e-mail and without petitioner's participation.

Among other communications, the revenue officers in California and Oregon communicated to the Appeals officer concern about assets that petitioner may have transferred to a nominee.

Also, the revenue officer in Oregon suggested to the Appeals officer and to the offer specialist that they should "probe and inquire if there were any links or money stream to * * * [petitioner]" relating to a home in Oregon.

On May 27, 2004, the offer specialist recommended that the Appeals Office reject petitioner's OIC, explaining that petitioner had paid insufficient individual estimated taxes and that the eldercare business had paid insufficient payroll taxes. The offer specialist also explained that petitioner's OIC should be rejected because the outstanding taxes petitioner owed related to what the offer specialist described as "nominee, transferee, fraud issues –- case is filled with them as it is the basis of the assessments."

On May 26, 2005, the Appeals Office issued a notice of determination (notice) sustaining the tax lien filed against petitioner. Attached to the notice was the Appeals officer's general statement that petitioner's OIC was not in the best interest of the Government because of, among other things,

alleged nominee transfers of petitioner's real property and assets.

Petitioner timely petitioned the Tax Court for review of the notice.

OPINION

When underlying taxes are not in dispute, as in the instant case, we review respondent's adverse CDP determinations for abuse of discretion. Speltz v. Commissioner, 454 F.3d 782, 784-785 (8th Cir. 2006), affg. 124 T.C. 165 (2005); Sego v. Commissioner, 114 T.C. 604, 610 (2000); Goza v. Commissioner, 114 T.C. 176, 181-182 (2000). Respondent will be regarded as abusing his discretion when he acts without a sound basis in fact or law. Freije v. Commissioner, 125 T.C. 14, 23 (2005); Woodral v. Commissioner, 112 T.C. 19, 23 (1999).

In prior years, and with a great deal of effectiveness and propriety, respondent's Appeals officers generally were allowed to communicate with respondent's revenue agents and officers concerning a taxpayer's outstanding taxes.

In 1998, however, after a series of hearings relating to respondent's collection practices,[4] Congress enacted and the

_____

[4] For news reporting on the 1997 and 1998 congressional hearings on tax collection reform, see Taxes at the Top, The Newshour with Jim Lehrer (PBS television broadcast Jun. 4, 2004) (transcript available at http://www.pbs.org/newshour/bb/business /jan-june04/tax_6-04.html).

President signed into law the Internal Revenue Service

Restructuring and Reform Act of 1998, Pub. L. 105-206, 112 Stat.

685 (RRA 1998).[5]

In RRA 1998, Congress provided, among other things, in new

section 6320 that respondent's Appeals officers conducting CDP

hearings are to be impartial and are not to have had prior

involvement in a taxpayer's outstanding taxes for the years

involved in a CDP hearing.  See sec. 6320(b)(3).  The language of

section 6320(b)(3) provides as follows:

> SEC. 6320(b).  Right to Fair Hearing.--
>
> \*      \*      \*      \*      \*      \*      \*
>
> (3) Impartial officer.--The hearing under this subsection shall be conducted by an officer or employee who has had no prior involvement with respect to the unpaid tax specified in subsection (a)(3)(A) before the first hearing under this section or section 6330.  A taxpayer may waive the requirement of this paragraph.

In RRA 1998 sec. 1001(a)(4), 112 Stat. 689, Congress also

directed that respondent's Appeals officers should exercise

independent judgment, and Congress prohibited respondent's

Appeals officers from engaging in ex parte communications with

other employees of respondent that would appear to compromise the

---

[5]  See generally 144 Cong. Rec. 14688-14689, 14694-14717, 14719-14722, 14726-14727, 14730-14733, 14735-14737, 14739, 14789-14795 (1998).

Appeals officers' judgment.  The relevant language of RRA 1998

sec. 1001(a) provides as follows:

>     (a) In General.--The Commissioner of Internal
> Revenue shall develop and implement a plan to
> reorganize the Internal Revenue Service.  The plan
> shall--
>
>             *       *       *       *       *       *       *
>
>     (4) ensure an independent appeals function within
> the Internal Revenue Service, including the prohibition
> in the plan of ex parte communications between appeals
> officers and other Internal Revenue Service employees
> to the extent that such communications appear to
> compromise the independence of the appeals officers.

Under authority of the above flush language of RRA 1998 sec.

1001(a), respondent promulgated Rev. Proc. 2000-43, 2000-2 C.B.

404, effective for administrative CDP appeals initiated after

October 23, 2000.  Id., sec. 4, 2000-2 C.B. at 409.  Therein ex

parte communications are defined as written or oral

communications that occur between Appeals officers and other

employees of respondent without the taxpayer, or his or her

representative, being able to participate in the communications.

Id., sec. 3, Q&A-1 and 2, 2000-2 C.B. at 405.

Rev. Proc. 2000-43, sec. 3, Q&A-5, 2000-2 C.B. at 405-406,

makes it clear that ex parte communications about substantive

matters, such as a taxpayer's credibility and the accuracy and

importance of alleged facts, are to be treated as improper ex

parte communications and are prohibited under RRA 1998 sec. 1001(a)(4).

Rev. Proc. 2000-43, supra, specifies that respondent's Appeals officers should not communicate with respondent's revenue agents and officers if the communications would, or would appear to, compromise the independent judgment of the Appeals Office. Id. sec. 3, Q&A-29, 2000-2 C.B. at 409.

An exception is provided to the prohibited ex parte communications rule of Rev. Proc. 2000-43, supra, for communications that relate only to administrative, ministerial, or minor procedural matters.  Communications between an Appeals officer and a revenue officer about the location of missing file documents are listed as an example of ex parte communications that would be allowed.  Id. sec. 3, Q&A-5.

In Drake v. Commissioner, 125 T.C. 201, 210 (2005), we remanded a CDP case to respondent's Appeals Office because of documents that were regarded by the Court as ex parte and prohibited.

Herein, the Appeals officer and the offer specialist should have carefully restricted the communications they had with the revenue officers relating to the collection of petitioner's taxes to mere administrative, ministerial, or minor procedural matters.

The suggestions by the California and Oregon revenue officers to the Appeals officer and to the offer specialist to

consider a nominee theory and to look at petitioner's "money stream" were substantive in nature and clearly constituted prohibited ex parte communications that were per se prejudicial to petitioner.

Respondent argues that grounds independent of the ex parte communications would support the Appeals Office's adverse determination (namely, petitioner's conviction for tax evasion and noncompliance by petitioner's eldercare business with certain Federal employment tax laws). These alleged grounds do not overcome or render moot the prohibited ex parte communication rules, as respondent appears to argue.

Respondent also argues that because petitioner eventually learned from the Appeals officer the content of the ex parte communications, petitioner was not kept in the dark with regard thereto and was not harmed. Nothing, however, in either RRA 1998 or Rev. Proc. 2000-43, supra, allows respondent's Appeals officer to avoid the rule against prohibited ex parte communications by later informing the taxpayer about the communications.

Respondent characterizes the ex parte communications as "routine factual investigation." We disagree. Although the ex parte communications may have been in good faith and intended to assist in the development of relevant facts, they were ex parte and substantive, and they were covered by the prohibition discussed above.

Respondent points out that Rev. Proc. 2000-43, sec. 3, Q&A-10, 2000-2 C.B. at 406, allows Appeals officers to pass on to respondent's other employees new information received by an Appeals officer.  Q&A-10, however, addresses new information "presented by the taxpayer," not new information obtained by the Appeals Officer via ex parte communications from other of respondent's employees.  Respondent misreads Q&A-10.

We recognize that under section 7122(a) respondent is given broad discretion to consider and to reject offers-in-compromise, and we defer to respondent's discretion when it is properly exercised.  Mailman v. Commissioner, 91 T.C. 1079, 1082 (1988).  However, the communications before us clearly constituted prohibited ex parte communications.

We turn to the appropriate remedy.

In Robert v. United States, 364 F.3d 988 (8th Cir. 2004), affg. 91 AFTR 2d 2003-602, 2003-1 USTC par. 50,212 (E.D. Mo. 2003), the District Court and the Court of Appeals for the Eighth Circuit refused to quash administrative third-party summonses that were issued based on information respondent obtained through prohibited ex parte communications.  The Court of Appeals for the Eighth Circuit explained that it affirmed the District Court's order enforcing summonses because "The Supreme Court has stated that courts should be slow to erect barriers to enforcement of [respondent's] summonses where the summonses are being used to

further [respondent's] mission of effectively investigating taxpayer liabilities", id. at 996 (quoting United States v. Euge, 444 U.S. 707,711 (1980)), and because Congress did not provide in RRA 1998 a specific remedy for prohibited ex parte communications.

Under Rev. Proc. 2000-43, sec. 3, Q&A-28 and 29, 2000-2 C.B. at 409, the availability of administrative and personnel remedies for violations of ex parte communications is acknowledged. Herein, in light of the prohibited ex parte communications that occurred, respondent's Appeals Office should have addressed the prejudice caused by these communications by providing some administrative remedy, such as reassignment to a new Appeals officer. Respondent's failure to do so constituted a failure on the part of respondent to give petitioner an impartial hearing and constituted an abuse of respondent's discretion.

On the facts before us in this case, remand of this case to respondent's Appeals Office is appropriate. By remand, we allow respondent to cure the defect that occurred in petitioner's CDP hearing in accordance with respondent's existing administrative procedures.

We acknowledge that where ex parte communications have occurred but where the taxpayer is making frivolous underlying arguments, it may not be appropriate to grant any relief to the taxpayer. For example, in Sapp v. Commissioner, T.C. Memo. 2006-

104, ex parte communications allegedly occurred in which the taxpayer was referred to disparagingly as a tax protester. Because the taxpayer relied solely on underlying frivolous arguments, we refused to remand the case to the Appeals Office, and we entered a decision for respondent.

Although petitioner was convicted of tax fraud for earlier years, there is no indication that petitioner herein relies on frivolous arguments.

For the reasons stated, we shall remand this case to respondent's Appeals Office. Respondent's Appeals Office is to identify and apply an appropriate administrative remedy to avoid prejudice attaching to petitioner as a result of the prohibited ex parte communications that occurred. If respondent determines that the appropriate remedy to offer petitioner is a new CDP hearing with respondent's Appeals Office, all references to the prohibited ex parte communications that occurred herein are to be deleted from respondent's administrative file, including any copy of this opinion that itself would inform a new Appeals officer of the prohibited ex parte communications.

To reflect the foregoing,

<u>An appropriate order will</u>

<u>be issued</u>.