# United States Court of Appeals
## For the Eighth Circuit
_____

No. 19-3786
_____

Jason Stewart; Kristy Stewart

*Appellant*s

v.

Commissioner of Internal Revenue

*Appellee*
_____

United States Tax Court
_____

Submitted: November 19, 2020
Filed: June 8, 2021
_____

Before SHEPHERD, STRAS, and KOBES, Circuit Judges.
_____

STRAS, Circuit Judge.

Are taxpayers entitled to a new hearing because a revenue officer included notes and correspondence about a meeting with their attorney in the official file that was later made available to the settlement officer who reviewed the case? The tax court[1] said no, and we agree.

---

[1]The Honorable Kathleen Kerrigan, United States Tax Court Judge.

I.

Jason and Kristy Stewart made over a million dollars between 2015 and 2016 without paying much in federal income taxes. The Internal Revenue Service assessed deficiencies and penalties, but the Stewarts still did not pay. Once the IRS placed a lien on their assets, however, the Stewarts requested a due-process hearing. Their position was that the lien should be discharged and withdrawn because they could not afford to pay their outstanding balance.

Assigned to the case was IRS Revenue Officer Jeffrey Wagner, who began his investigation by showing up unannounced to speak with the Stewarts' attorney at his office. *See* Internal Revenue Manual ("IRM") 5.15.1.2(4) (July 24, 2019) (describing a revenue officer's duties, including making "initial contact"). After the meeting, which did not go well, Wagner placed detailed notes in the IRS's administrative file. They described the attorney as "uncooperative," in part because he refused to provide the Stewarts' financial information upon request, saying that he would only send it "directly to the Office of Appeals." Then, following some further discussion, he abruptly ended the meeting by saying "we're done" and "direct[ing] [Wagner] to get out of his office."

Wagner also drafted a letter, which he sent to the attorney and placed in the administrative file later that day. Summarizing what had happened at the meeting, the letter, just like the notes, discussed the attorney's "refus[al] to provide any collection information and . . . brusque[] direct[ion] . . . to leave [his] office." And it made clear that Wagner did not appreciate the "complete refusal to provide or even entertain providing" the financial information he had requested.

Two other key developments followed. First, on the same day as the meeting, the IRS officially notified the Stewarts through what is called a "notice of intent to levy" that it planned to seize their assets. Second, the Stewarts eventually received their due-process hearing, in which a number of "collection alternatives" were "discussed" with Settlement Officer Gregory Wert. One was "placing [their

account] in currently noncollectible . . . status," which would temporarily halt the proposed levy. *See Lantz v. Comm'r*, 607 F.3d 479, 487 (7th Cir. 2010).

Based on the administrative file, a financial analysis prepared by Wagner, and the hearing itself, Wert decided that the Stewarts were not eligible for noncollectible status. Then, in a petition to the United States Tax Court, the Stewarts argued that the notes and letter were improper ex-parte communications that prejudiced Wert against them. The tax court disagreed on the ground that otherwise prohibited "statements" can be included in the administrative file as long as they are made "contemporaneously" and "are pertinent to . . . consideration of the case." Rev. Proc. 2012-18, § 2.03(4)(d), 2012-10 I.R.B. 455, 460.

## II.

This administrative-file rule, as we will call it, is part of a broader attempt to preserve "the independence of" settlement officers from other parts of the IRS. *Robert v. United States*, 364 F.3d 988, 994 (8th Cir. 2004); *see* Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, § 1001(a)(4), 112 Stat. 685, 689. Independence includes separation between the investigative and adjudicative functions, so the IRS has restricted communications between the two, at least when the taxpayer is not included. *See* Rev. Proc. 2012-18, § 2.01(1), 2012-10 I.R.B. at 456. Specifically, certain comments and statements—particularly those about "the demeanor or credibility of the taxpayer or taxpayer's representative" and "the level of cooperation (or lack thereof) of the taxpayer/representative during the [revenue officer's] consideration of the case"—are generally prohibited. *Id.* § 2.03(3)(c), (d), 2012-10 I.R.B. at 459.

Wagner's statements in the notes and letter fall directly within this general prohibition. The notes describe the Stewarts' attorney as "uncooperative" and provide specific examples: refusing to hand over financial information, ending the meeting abruptly, and telling Wagner "to get out of his office." The letter mirrors

these points. Each, in other words, comments on "the demeanor . . . of the . . . taxpayer's representative" and "the level of cooperation" he provided.[2] *Id.*

Generally prohibited, however, does not mean always. Under the administrative-file rule, "contemporaneous[]" statements may "permissibl[y]" be included in the file as long as they "are pertinent to the [revenue officer's] consideration of the case," even if they would otherwise be prohibited. *Id.* § 2.03(4)(d), 2012-10 I.R.B. at 460. Adoption of this rule suggests that, at least in some circumstances, the IRS has decided that the need for revenue officers to document their investigations trumps independence. *See id.*

This is one of those circumstances. There is no dispute that the statements in the notes and letter were contemporaneous. *Cf. Drake v. Comm'r*, 125 T.C. 201, 203 (2005) (involving comments and statements that were sent long after the events in question took place). Rather, the dispute here is about pertinence, with the Stewarts characterizing Wagner's comments as "gratuitous." Rev. Proc. 2012-18, § 2.03(4)(d), 2012-10 I.R.B. at 460 (prohibiting "gratuitous comments in the case history[ or] a memo to the file . . . if the substance of th[ose] comments would be prohibited if they were communicated to Appeals separate and apart from the administrative file").

Though the statements were undoubtedly "color[ful]," Oral Arg. at 7:20–22, they were not gratuitous, *see Webster's Third New International Dictionary* 992 (2002) (defining "gratuitous" as "[un]called for by the circumstances"); *The American Heritage Dictionary of the English Language* 767 (5th ed. 2016) (defining

---

[2]We reject the government's argument that these statements were merely "ministerial, administrative, or procedural." Rev. Proc. 2012-18, § 2.03(2), 2012-10 I.R.B. at 458. By commenting on the attorney's lack of cooperation, for example, Wagner did not limit himself to the purely administrative question of "whether certain information [had been] requested and received." *Robert*, 364 F.3d at 994 (noting that the IRS has adopted "a limited view of communications that would be considered ministerial and that could occur on an ex[-]parte basis").

"gratuitous" as "[u]nnecessary or unwarranted; unjustified"). After making "initial contact," Wagner had a duty to "[d]ocument the [case] history" when the taxpayer's representative proved "unable or unwilling to provide all the necessary information." IRM 5.1.10.3(9) (Feb. 26, 2016). The statements were "pertinent" precisely because they would serve as a reminder of the information that Wagner still needed to collect and what difficulties he might face in doing it. Rev. Proc. 2012-18, § 2.03(4)(d), 2012-10 I.R.B. at 460; *see Webster's Third New International Dictionary*, *supra*, at 1688 (defining "pertinent" as having "some connection or relation with"); *American Heritage Dictionary*, *supra*, at 1318 (defining "pertinent" as "[c]learly related to a matter at hand").

A central theme of the Stewarts' argument is that, once they requested a due-process hearing, Wagner never should have shown up and demanded financial information. A hearing request, however, does not suspend the IRS's investigation. *See* IRM 5.1.9.5.3(5) (Feb. 7, 2014). To the contrary, revenue officers may "continue[] to work with the taxpayer by securing and evaluating financial information and contemporaneously documenting [the] case history." *Id.* Indeed, to determine whether the Stewarts' debt was noncollectible, the IRS had to evaluate their financial condition, so Wagner still had a role to play in gathering information in advance of the hearing. *See id.* at 5.1.10.3(10) (Mar. 24, 2020) ("Revenue officers will attempt to secure, review, and discuss financial statements in person in the field."); *id.* at 5.16.1.2(2) (Jan. 1, 2016) (explaining that certain financial information is generally required before placing an account on currently noncollectible status); *Rosendale v. Comm'r*, 116 T.C.M. (CCH) 4, 6 (2018) (noting that a taxpayer qualifies only if he is unable to pay).

Nor are the Stewarts entitled to a new hearing before a different settlement officer just because judicial-conduct rules impose stricter limitations on ex-parte communications than the IRS does. *See, e.g.*, Model Code of Judicial Conduct r. 2.9(A) (Am. Bar Ass'n 2020); *United States v. Earley*, 746 F.2d 412, 413, 415–17 (8th Cir. 1984) (involving a "trial brief" sent to the district court but not given to opposing counsel). Settlement officers are not judges, and the IRS decided early on

that it would "not adopt the formal *ex parte* procedures that would apply in a judicial proceeding."  Rev. Proc. 2012-18, § 1, 2012-10 I.R.B. at 456; *accord* Rev. Proc. 2000-43, § 2, 2000-43 I.R.B. 404, 405; *see also Hoyle v. Comm'r*, 136 T.C. 463, 469 (2011) (rejecting the taxpayer's reliance on judicial-conduct rules because "[t]hey do not govern the matters before us and are not applicable").  For these reasons, the Stewarts are not entitled to a new hearing.

## III.

We accordingly affirm the judgment of the tax court.

_____